## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MINNESOTA

| | |
|---|---|
| LEE BULL, DAE SOB YOON, JAMIE SHELLER, ROBIN GUTZLER, individually and on behalf of all others similarly situated, | CASE NO.:_____ |
| Plaintiffs, | **JURY TRIAL DEMANDED** |
| v. | |
| AUDI AG and AUDI OF AMERICA, LLC | |
| Defendants. | |

## CLASS ACTION COMPLAINT

Plaintiffs Lee Bull, Dae Sob Yoon, Jamie Sheller, and Robin Gutzler (collectively, "Plaintiffs"), individually and on behalf of the other members of the below-defined nationwide and statewide classes they respectively seek to represent (collectively, the "Class"), hereby allege against Defendants Audi AG and Audi of America, LLC (unless otherwise indicated, both Defendants are collectively referred to as "Audi"), upon personal knowledge as to themselves and their own acts, and as to all other matters upon information and belief, based upon the investigation made by the undersigned attorneys, as follows:

## NATURE OF THE ACTION

1.      Plaintiffs bring this proposed class action for damages on behalf of themselves and all other persons and entities nationwide who purchased or leased an Audi vehicle equipped with a ZF 8HP55 "AL 551" transmission, including, but not limited, to Audi A6, A8, Q5 and Q7 models with 3.0 liter gasoline engines and automatic transmissions. (the "Class Vehicles").

1

2.      Unbeknownst to Plaintiffs, the vehicles purchased by them, like all of the Class Vehicles, are equipped with "defeat devices." These defeat devices are designed to surreptitiously limit emissions and increase fuel efficiency when the vehicles are being subject to regulatory emissions and fuel efficiency testing. Otherwise, when the vehicles are in regular use on the road, the Class Vehicles emit a substantially increased amount of noxious gasses. Audi sold the Class Vehicles to Plaintiffs and the other class members without informing them of the existence of the defeat devices, and by falsely representing to them that the Class Vehicles were compliant with all relevant emissions standards in normal use.

3.      Plaintiffs and the members of the class all suffered damages as a result of Audi's misrepresentations and omissions regarding the defeat device. Plaintiff and class members overpaid to purchase vehicles incapable of providing the balance of performance, efficiency, and cleanliness that Audi represented them to offer. Plaintiff and the class members have also suffered diminution of vehicle value now that the existence of the defeat devices has been revealed publicly. Accordingly, Plaintiff and similarly situated owners and lessees of the Class Vehicles are entitled to compensation for their losses, including losses related to increased fuel expenditures.

## JURISDICTION AND VENUE

4.      This Court has diversity jurisdiction over this action under 28 U.S.C. §§ 1332(a) and (d) because the amount in controversy for the Class exceeds $5,000,000, and Plaintiffs and other Class members are citizens of a different state than Defendant.

5.      The Court has personal jurisdiction over Audi AG and Audi of America, LLC because each has purposefully availed itself of the privilege of conducting business in the State

of Minnesota by advertising and selling Audi vehicles (including the Class Vehicles at issue) within the State of Minnesota. Additionally, each has maintained systematic and continuous business contacts with the State of Minnesota.

6.      Venue is proper in this District under 28 U.S.C. § 1391 because Audi AG and Audi of America, LLC are deemed to reside in any judicial district in which they are subject to personal jurisdiction. Additionally, Plaintiff Lee Bull purchased his Class Vehicle within this District.

## PARTIES

1.      Plaintiff Lee Bull is an adult resident of Minnesota, and owner of a 2017 Audi Q7 3.0TFSI. Ms. Bull bought her vehicle in 2016 from Audi Minneapolis in Golden Valley, MN 55426.

2.      Plaintiff Dae Sob Yoon is an adult resident of Florida, and owner of a 2014 Audi A6 3.0. Mr. Yoon bought his vehicle in 2013 from Audi of Tampa in Tampa, FL 33612.

3.      Plaintiff Jamie Sheller is an adult resident of Pennsylvania, and owner of a 2012 Audi Q7 3.0T Quattro Tiptronic. Ms. Sheller bought her vehicle in 2011 from Wynnewood Audi in Wynnewood, PA 19096.

4.      Plaintiff Robin Gutzler is an adult resident of Missouri, and owner of a 2016 Audi A6 3.0T Premium Plus. Ms. Gutzler bought her vehicle in 2015 at Audi Creve Couer in Creve Couer, MO 63141.

5.      Defendant Audi of America, LLC ("Audi America") is a Delaware limited liability company with its principal place of business located at 2200 Ferdinand Porsche Dr.,

Herndon, Virginia 20171. Audi America is a wholly-owned U.S. subsidiary of Audi AG, and it

has engaged in business, including the advertising, marketing, and sale of Audi automobiles, in

all 50 states.

6.      Audi AG is a German corporation with its principal place of business in

Ingolstadt, Germany. Audi AG is the parent company of Audi of America, LLC and a

subsidiary of the Audi Group, which is a wholly-owned subsidiary of VW AG. Audi AG

designs, develops, manufactures, and sells luxury automobiles. According to Audi AG, the

Audi Group sold more than 200,000 vehicles in the United States in 2015.

## FACTUAL ALLEGATIONS

7.      As was recently revealed, and as was met with great public outcry, Audi and its

parent Volkswagen had for years been engaged in a scheme to hide the true emissions of their

"clean diesel" vehicles by equipping these vehicles with a defeat device. Extensive litigation

ensued, and Volkswagen executives apologized profusely.

8.      Recently, the California Air Resources Board (CARB) determined that Audi

had also surreptitiously installed a gearing related defeat device in the Class Vehicles. The

defeat device was used to circumvent the class vehicles' emission control systems that exist to

comply with Clean Air Act emissions standards. This defeat device revelation involving the

Class Vehicles is separate from the scandal involving the Audi and Volkswagen "clean diesel"

vehicles.

9.      Audi installed the cheat device software in cars equipped with the automatic

transmission with an internal designation of AL 551. The AL 551 model is part of the ZF 8HP

family of eight-speed units Audi sources from transmission supplier ZF Friedrichshafen,

commonly known as ZF.

10.    Audi installed the AL551 transmissions equipped with the cheat device in the following vehicles: A6, A8, Q5 and Q7 manufactured through May of 2016.

11.    The defect device is a sleight of hand software program designed by Volkswagen's engineers that directs the engine to run in low power "clean" mode during emissions testing, so as to be CAA compliant.

12.    During the CARB testing, the vehicle's transmission control module sets shift points that produced compliant emission results under the calibration that Volkswagen referred to as the "dyno calibration." The subject vehicles can detect static dynometer lab conditions and will operate in low power mode until exposed to actual road conditions.

13.    Audi engineers concluded that the only time the subject vehicles would run continuously with no steering wheel input would be in a lab, on a test bed. At all other times during normal road operation, the transmission computer offers full power to the driver as the transmission software switched to "road calibration" which increased fuel consumption and the corresponding carbon dioxide emissions.

14.    Specifically, when a subject vehicle is cranked, its transmission engages a "low CO2" program, shifting gears early to maintain artificially low engine revs and emissions. Once the driver inputs 15 degrees of turn into the steering wheel, the subject vehicle deactivates the program and shifts into its normal, more pollutant fashion that consumes more fuel, delivers more power and produces more CO2.

15.    Audi's cheat device program utilizes that principle that fewer droplets of fuel

burned equates to fewer carbon monoxide emissions.  While in the "dyno calibration" the subject vehicles are not being asked to deliver advertised power and performance capabilities. Instead, the dynamometer operator accelerates the vehicle to a predetermined test speed, unconcerned with shift points and torque values.

16.    Simply put, the cheat device program equips the subject vehicles with two personalities. The "dyno calibration" personality reduces fuel supply and limits rpms per gear, thereby reducing fuel burn and emissions to deceive emissions test operators.  While the "road calibration" personality allows the engine to turn maximum rpms in each gear and provides the necessary fuel supply required to deliver advertised torque and performance.

17.    Upon information and belief, the cheat device software is imbedded in the transmission control module ("TCM").  The TCM's primary function is to establish shift logic by reacting to signals from sensors monitoring coolant temperature, exhaust temperature, ignition timing, crankshaft and camshaft positioning, fuel mixture and air flow volumes.

18.    Upon information and belief, the TCM and engine control unit ("ECU") work in tandem to execute the actual cheat function.  Upon information and belief, engineers imbedded the cheat software in the TCM unit, intentionally making its detection less probable.

## TOLLING OF STATUTE OF LIMITATIONS

### A.    Fraudulent Concealment Tolling

19.    Upon information and belief, prior to the date of this Complaint, Audi knew of the defeat device in the Class Vehicles, but continued to distribute, sell, and/or lease the Class Vehicles to Plaintiffs and the other class members. In so doing, Audi concealed from and failed

to notify Plaintiffs and the other class members about the true nature of the Class Vehicles. Any applicable statute of limitations has therefore been tolled by Audi's knowledge, active concealment, and denial of the facts alleged herein.

**B.      Estoppel**

20.      Audi was under a continuous duty to disclose to Plaintiffs and the other class members the existence of the defeat device, which substantially affects the true character, quality, performance, and nature of the Class Vehicles. Audi actively concealed the true nature, quality, performance, and nature of the defeat device in the Class Vehicles, and Plaintiffs and the other class members reasonably relied upon Audi's knowledge and active concealment of these facts. Audi is accordingly estopped from relying on any statute of limitations in this action. For these same reasons, Audi is estopped from relying upon any warranty mileage and age limitations in defense of this action.

**C.      Discovery Rule**

21.      The claims for relief alleged herein did not accrue until Plaintiff and the class members discovered that the Class Vehicles contained the defeat device.

22.      Plaintiffs and the class members had no realistic ability to identify the defeat device until November 7, 2016, when published reports surfaced for the first time disclosing the existence of the defeat device.

23.      Despite their exercise of due diligence, Plaintiffs and the other class members were not reasonably able to discover the defeat device until after they purchased or leased the Class Vehicles. Accordingly, their claims for relief did not accrue until they discovered that the

defeat device caused the Class Vehicles to fail required emissions standards.

## CLASS ACTION ALLEGATIONS

24.    Plaintiffs bring this lawsuit as a class action pursuant to Federal Rules of Civil Procedure 23(a), (b)(1), (b)(2), and/or (c)(4), on behalf of themselves and all others similarly situated as members of the following Nationwide Class and State Classes (collectively, the "Classes"),on their federal and state claims as the purchasers and lessees of the Class Vehicles.

25.    The proposed Classes are defined as:

**Nationwide Class**

All persons and entities in the United States, including its territories, who purchased or leased a Class Vehicle.

**Florida Class**

All persons and entities in the state of Florida who purchased or leased a Class Vehicle.

**Minnesota Class**

All persons and entities in the state of Minnesota who purchased or leased a Class Vehicle.

**Missouri Class**

All persons and entities in the state of Missouri who purchased or leased a Class Vehicle.

**Pennsylvania Class**

All persons and entities in the state of Pennsylvania who purchased or leased a Class Vehicle.

26.    Excluded from the Classes are: (A) Defendants, including any entity or division in which Defendants have a controlling interest, as well as their agents, representatives, officers, directors, employees, trustees, parents, children, heirs, assigns, and successors, and other persons or entities related to, or affiliated with Defendants; (B) the Judges to whom this case is assigned,

theirs staff, and their immediate families; and (C) governmental entities. Plaintiffs reserve the right to amend the Class definitions if discovery and further investigation reveal that any Class should be expanded, divided into additional subclasses under Rule 23(c)(5), or modified in any other way.

27.     Certification of Plaintiffs' claims for class-wide treatment is appropriate because Plaintiffs can prove the elements of their claims on a class-wide basis using the same evidence as would be used in individual actions alleging the same claims.

28.     This action has been brought and may be properly maintained on behalf of each of the Classes proposed herein under Federal Rule of Civil Procedure 23 and satisfies the numerosity, commonality, typicality, adequacy, predominance, and superiority requirements of its provisions.

**Numerosity and Ascertainability**

29.     The members of the Classes are so numerous and geographically dispersed that individual joinder of all Class members is impracticable. On information and belief, there are tens of thousands of members in the Nationwide Class, and at least hundreds of members in each of the State Classes.  The precise number and identities of Nationwide Class and State Class members may be ascertained from Defendants' books and records and motor vehicle regulatory data. Class Members may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. Mail, electronic mail, Internet postings, and/or published notice.

**Typicality**

30.     The claims of the representative Plaintiffs are typical of the claims of the other Class members in that the representative Plaintiffs, like all Class members, purchased or leased a

Class Vehicle designed, manufactured, and distributed by Audi, which was equipped with a defeat device. The representative Plaintiffs and other Class members have been damaged by Defendants' misconduct in that they have incurred similar or identical losses relating to the Class Vehicles. Furthermore, the factual bases of Defendants' misconduct are common to all Class members and represent a common thread of misconduct resulting in injury to all Class members.

**Adequate Representation**

31.     Plaintiffs are members of the Nationwide and State classes and will fairly and adequately represent and protect the interests of the Classes. Plaintiffs have retained counsel with substantial experience in prosecuting consumer class actions, including class actions involving defective products generally, and defective automobile systems and parts specifically. Plaintiffs and their counsel are committed to vigorously prosecuting this action on behalf of the Classes and have the financial resources to do so. Neither Plaintiffs nor their counsel have interests adverse to those of the Classes.

**Predominance of Common Questions**

32.     There are numerous questions of law and fact common to Plaintiffs and Class members that predominate over any question affecting only individual Class members. The answer to these common questions will advance the adjudication or resolution of the litigation as to all Class members. These common legal and factual questions include:

a.     whether Defendants designed, manufactured, advertised, marketed, distributed, leased, sold, or otherwise placed the Class Vehicles and/or their emissions-related systems, including defeat devices, into the stream of commerce in the United States;

b.     whether the Class Vehicles contained a defeat device and emitted unlawful levels of carbon dioxide under normal operation;

c.      whether Defendants knew or should have known about the defeat device and emission levels in the Class Vehicles;

d.      whether the true nature of the Class Vehicle's performance, emissions levels, fuel economy, and the inclusion of the defeat device constitute material facts that reasonable consumers would have considered in deciding whether to purchase a Class Vehicle;

e.      whether Class members overpaid for their Class Vehicles;

f.      whether Defendants made material misrepresentations regarding the Class Vehicles;

g.      whether Defendants had a duty to disclose the true nature of the Class Vehicles to Plaintiff and Class members;

h.      whether Defendants omitted, actively concealed and/or failed to disclose material facts about the Class Vehicles;

i.      whether Defendants' concealment of the true nature of the Class Vehicles would have induced a reasonable consumer to act to their detriment by purchasing and/or leasing the Class Vehicles;

j.      whether the Class Vehicles can be made to comply with EPA and state emission standards without substantially degrading their performance and/or efficiency;

k.      whether Defendants' conduct violated consumer protection statutes, warranty laws, and other laws as alleged herein;

l.      whether Plaintiffs and Class members are entitled to a declaratory judgment;

m.      whether Plaintiffs and Class members are entitled to equitable relief, including, but not limited to, a preliminary and/or permanent injunction; and

n.    whether Plaintiffs and Class members are entitled to damages and other monetary relief, and if so, what types and under what formula.

**<u>Superiority</u>**

33.    Defendants' scheme treated consumers as a Class to be uniformly deceived. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy. Plaintiffs and Class members have all suffered and will continue to suffer economic harm and damage as a result of Defendants' unlawful and wrongful conduct, which was directed toward Class members and the public as a whole, rather than specifically or uniquely against any individual Class members.

34.    Defendants have acted in a uniform manner with respect to the Plaintiffs and Class members. Absent a class action, most Class members would likely find the cost of litigating their claims prohibitively high and would therefore have no effective remedy at law. Because of the relatively small size of the individual Class members' claims, it is likely that only a few Class members could afford to seek legal redress for Defendants' misconduct. Absent a class action, Class members will continue to incur damages, and Defendants' misconduct will continue with effective remedy.

35.    Class treatment in this Court will conserve the resources of the courts and the litigants, and will promote consistency and efficiency of adjudication by providing common answers to the common questions of knowledge, conduct, duty and breach, that predominate in this action.

36.    Classwide declaratory, equitable, and injunctive relief is appropriate under Rule 23(b)(1) and/or (b)(2) because Defendants have acted on grounds that apply generally to the class, and inconsistent adjudications with respect to the Defendants' liability would establish

incompatible standards and substantially impair or impede the ability of Class members to protect their interests. Classwide relief and Court supervision under rule 23 assures fair, consistent, and equitable treatment and protection of all Class members, and uniformity and consistency in Defendants' discharge of their duties to perform corrective action regarding the Class Vehicles.

## CLAIMS FOR RELIEF

### FEDERAL CLAIMS

### FEDERAL COUNT I
### Violation of 15 U.S.C. §§ 2301, *et seq.*,
### The Magnuson-Moss Warranty Act ("MMWA")

37.    Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

38.    Plaintiffs bring this Count on behalf of themselves and the Nationwide Class.

39.    This Court has jurisdiction to decide claims brought under 15 U.S.C. § 2301 by virtue of 28 U.S.C. § 1332 (a)-(d).

40.    Plaintiffs are "consumers" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(3).

41.    Defendants are "supplier[s]" and "warrantor[s] within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(4)-(5).

42.    The Class Vehicles are "consumer products" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(1).

43.    15 U.S.C. § 2310(d)(1) provides a cause of action for any consumer who is damages by the failure of a warrantor to comply with a written or implied warranty.

44.     The Defendants provided Plaintiff and the Nationwide Class with the following two express warranties, which are covered by 15 U.S.C. § 2301(6): (1) "bumper-to-bumper" limited express warranty coverage for a minimum of 4 years or 50,000 miles, whichever comes first, and which covers emission related repairs; and (2) a federal emissions warranty that covers the repair and replacement of all emission control and emission-related parts for two years or 24,000 miles (whichever comes first), and covers specified major emission control components, including catalytic converters, electronic emissions control unit or computer and on-board emissions diagnostic device or computer for 8 years or 80,000 miles (whichever comes first).

45.     The Class Vehicles implied warranties are covered under 15 U.S.C. § 2301(7).

46.     The Defendants breached these warranties as described in more detail above. Without limitations, the Class Vehicles share a common design defect in that they emit more carbon dioxide than: (a) is allowable under the applicable regulations, and (b) the Defendants represented were emitted to their customers, the public, and regulators.

47.     Plaintiffs and members of the Nationwide Class have had sufficient direct dealings with Defendants or their agents (dealerships) to establish privity of contract between Defendants, on the one hand, and Plaintiffs and other Class members, on the other hand. Nonetheless, privity is not required here because Plaintiffs and each of the other Class members are intended third-party beneficiaries of contracts between Defendants or their dealers, and of their implied warranties. The dealers were not intended to be the ultimate users of the Class Vehicles and have no rights under the warranty agreements provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit consumers only.

48.     Affording the Defendants a reasonable opportunity to cure their breach of warranties would be unnecessary and futile. At the time of sale or lease of each Class Vehicle,

the Defendants knew of the misrepresentation concerning the Class Vehicles' inability to perform as warranted, but nonetheless failed to rectify the situation and/or disclose the defective design. Under the circumstances, the remedies available under any informal settlement procedure would be inadequate, and any requirement that Plaintiffs or Class members resort to an informal dispute resolution procedure and/or afford the Defendants a reasonable opportunity to cure their breach of warranties is excused and thereby deemed satisfied.

49.     The amount in controversy of Plaintiffs' individual claims meets or exceeds the sum of $25. The amount in controversy of this action exceeds the sum of $50,000, exclusive of costs and interest, computed on the basis of all claims to be determined in this lawsuit. Plaintiffs, individually and on behalf of the Nationwide Class, seeks all damages permitted by law, including diminution in the value of their vehicles, in an amount to be proven at trial.

## COMMON LAW CLAIMS

### COMMON LAW COUNT I
### FRAUD

50.     Plaintiffs incorporate Paragraphs 1-42 by reference, as though fully set forth herein.

51.     Plaintiffs bring this Count on behalf of themselves and the Nationwide Class or, in the alternative, on behalf of the State Classes.

52.     As alleged above, Defendants intentionally concealed and suppressed material facts concerning the illegality and quality of the Class Vehicles in order to defraud and mislead both regulators and the Class about the true nature of the Class Vehicles. Defendants accomplished their scheme (and the concealment thereof) by installing, aiding in the installation of, and/or failing to disclose the defeat devices in the Class Vehicles that caused the vehicles to

operate in a low-emission test monde only during testing. During normal operation and use, the Class Vehicles emitted significantly larger quantities of carbon dioxide. The result was precisely what Defendants intended—the Class Vehicles were able to pass emission testing by way of deliberately-induced false readings and thus successfully imported and sold and/or leased thousands of unwitting American consumers.

53.    Defendants represented that the Class Vehicles had functioning emissions systems that operated within legal limits during normal driving conditions.

54.    Defendants' false representations and omissions were material to consumers, as they concerned the legality and marketing features of the Class Vehicles.

55.    Plaintiffs and Class members reasonably relied on Defendants' deception, and Defendants intended that they would so rely. Plaintiffs and Class members had no way of discerning that Defendants were, in fact, deceiving them because the defeat devices were sophisticated technology that could not be discerned by regulators, much less consumers.

56.    Defendants' scheme to design and install defeat device software in the Class Vehicles for the specific purpose of circumventing U.S. law, and then concealing their fraudulent scheme, reveals a corporate culture that emphasized sales and profits over integrity and public health.

57.    Defendants had a duty to disclose the defeat devices to regulators and the driving public.

58.    Defendants hatched the deceptive scheme and knew that its customers, including Plaintiff and Class members, did not know about, and could no reasonably discover, its scheme.

16

59.     Plaintiffs and Class members were not aware of the concealed and misrepresented material facts referenced above, and they would not have acted as they did had regulators or the driving public known the truth.

60.     As a direct and proximate result of Defendants' fraudulent scheme, Plaintiffs and Class members sustained damages. They own or lease Class Vehicles that are non-compliant and severely diminished in value as compared to the vehicles that were advertised or marketed. Moreover, the Class Vehicles either cannot be repaired to comply with applicable emissions standards, or if they can be made compliant, their performance, fuel efficiency, and longevity will be compromised.

61.     Defendants are liable to Plaintiffs and Class members for damages in an amount to be proven at trial. Moreover, because Defendants acted wantonly, maliciously, oppressively, recklessly, deliberately, and with intent to defraud Plaintiff and Class members for the purpose of enriching themselves at Plaintiff and Class members' detriment, Defendants' conduct warrants substantial punitive and exemplary damages in an amount to be determined at trial.

## COMMON LAW COUNT II
## BREACH OF CONTRACT

62.     Plaintiffs incorporate Paragraphs 1-42 by reference, as though fully set forth herein.

63.     Plaintiffs bring this Count on behalf of themselves and the Nationwide class, and in the alternative, on behalf of the State Classes.

64.     Every purchase or lease of a Class Vehicle from an authorized dealer of the Defendants constitutes a contract between the Defendants and the purchaser or lessee. The Defendants materially breached these contracts by selling or leasing Plaintiffs and Class

members defective, non-compliant Class Vehicles and by misrepresenting or failing to disclose the existence of the defeat device, rendering the Class Vehicles substantially less valuable than the vehicles that the Defendants advertised and promised to deliver to Plaintiffs and Class members.

65.     The Defendants' misrepresentations and omissions alleged herein caused Plaintiffs and the other Class members to enter into their agreements to purchase or lease their Class Vehicles. Absent those misrepresentations and omissions, Plaintiffs and Class members would not have purchased or leased their Class Vehicles and/or would not have purchased or leased their Class Vehicles at the prices they paid. Accordingly Plaintiffs and Class members overpaid for their Class Vehicles and did not receive the benefit of their bargain.

66.     Defendants also breached their implied covenant of good faith and fair dealing under the laws of all 50 states and the District of Columbia. By delivering a vehicle that contained defeat device software and thus exceeded, during normal sue, federal and state emission limits, the Defendants blatantly violated Plaintiffs and other Class members' fair and reasonable expectations under their respective contracts. In addition, Defendants misrepresentations and omissions violated Defendants' implied duty to deal honestly, and within reasonable commercial standards of fair dealing, with Plaintiffs and the other Class members.

67.     As a direct and proximate result of Defendants' breach, Plaintiffs and the other Class members have been damaged in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

## COMMON LAW COUNT III
## UNJUST ENRICHMENT

68.     Plaintiffs incorporate Paragraphs 1-42 by reference, as though fully set forth herein.

69.     Plaintiffs bring this Count on behalf of themselves and the Nationwide Class and, in the alternative, on behalf of the State Classes.

70.     Defendants have benefitted from selling and leasing at an unjust profit defective Class Vehicles that had artificially inflated values due to Defendants' concealment of the defeat device, and Plaintiffs and the other Class members have overpaid for these vehicles.

71.     Defendants have received and retained unjust benefits from the Plaintiffs and other Class members, and inequity has resulted.

72.     It is inequitable and unconscionable for Defendants to retain these benefits.

73.     Because Defendants concealed their fraud and deception, Plaintiffs and the other Class members were not aware of the true facts concerning the Class Vehicles and did not benefit from Defendants' misconduct.

74.     Defendants knowingly accepted the unjust benefits of their fraudulent conduct.

75.     As a result of Defendants' misconduct, the mount of their unjust enrichment should be disgorged and returned to Plaintiffs and other Class members, in an amount to be proven at trial.

## STATE LAW STATUTORY CLAIMS

### FLORIDA

**FLORIDA COUNT I**
**VIOLATION OF FLORIDA'S UNFAIR & DECEPTIVE TRADE PRACTICES ACT**
**(Fla. Stat. § 501.201, *et seq.*)**

76.    Plaintiff Yoon (for the purpose of the Florida claims, "Plaintiff") incorporates Paragraphs 1-42 by reference, as though fully set forth here.

77.    Plaintiff brings this Count individually and on behalf of the Florida Class.

78.    Plaintiff is a "consumer" within the meaning of the Florida Unfair and Deceptive Trade Practices Act ("FUDTPA"), Fla. Stat. § 501.203(7).

79.    Defendants are engaged in "trade or commerce" within the meaning of Fla. Stat. § 501.203(8).

80.    FUDTPA prohibits "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce. . . ." Fla. Stat. § 501.204(1).

81.    Defendants participated in unfair and deceptive trade practices that violated the FUDTPA as described herein.

82.    In the course of their business, Defendants concealed and suppressed material facts concerning the Class Vehicles. Defendants accomplished this by designing and installing illegal defeat device software in the Class Vehicles that caused the vehicles to operate in a low emission test mode only during emissions testing. During normal operations, the class Vehicles would emit significantly larger quantities of carbon dioxide. The result was what Defendants intended—the Class Vehicles passed emissions testing by way of deliberately induced false readings. Defendants did not disclose the defeat device software to Plaintiff and the Florida Class

members, and Plaintiff and Florida Class members had no way of discovering this because Defendants' defeat device software was extremely sophisticated technology that Plaintiff and Florida Class members could not detect on their own.

83.     Defendants thus violated the FUDTPA by, at a minimum, employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Class Vehicles.

84.     Defendants engaged in misleading, false, unfair or deceptive acts or practices that violated the FUDTPA by designing, installing, failing to disclose and actively concealing the illegal defeat device and the Class Vehicles' illegality.

85.     The Clean Air Act and EPA regulations require that automobiles limit their emissions output to specified levels. These laws are intended for the protection of public health and welfare. "Defeat devices" like those in the Class Vehicles are defined and prohibited by the Clean Air Act and its regulations. See 42 U.S.C. § 7522(a)(3)(B); 40 CFR § 86.1809. By supplying and installing illegal "defeat devices" in the Class Vehicles and by making those vehicles available for purchase equipped with the defeat devices, Defendants violated federal law and therefore engaged in conduct that violates the FUDTPA.

86.     Defendants intentionally and knowingly misrepresented material facts regarding the Class Vehicles with intent to mislead Plaintiff and the Florida Class.

87.     Defendants knew or should have known that their conduct violated the FUDTPA.

88.     Defendants owed Plaintiff and the Florida Class members a duty to disclose the illegality and public health and safety risks of the Class Vehicles because they:

a.      possessed exclusive knowledge that they were manufacturing, selling, and distributing vehicles throughout the United States that did not comply with EPA and state emissions regulations;

b.      intentionally concealed the foregoing from regulators, Plaintiff, and Florida Class members, and/or;

c.      made incomplete representations about the illegality, emissions, and efficiency of the Class Vehicles generally, and the use of the defeat device in particular, while purposefully withholding material facts from Plaintiffs that contradicted these representations.

89.      Defendants' fraudulent and illegal use of the defeat device and its concealment of the true characteristics of the Class Vehicles was material to Plaintiff and the Florida Class.

90.      Defendants' unfair or deceptive acts or practices were likely to and did, in fact, deceive regulators and reasonable consumers, including Plaintiff and Florida Class members about the illegality, emissions, and efficiency of the Class Vehicles.

91.      Plaintiff and the Florida Class suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' misrepresentations and their concealment of and failure to disclose material information. Plaintiff and the Florida Class members who purchased or leased the Class Vehicles would not have purchased or leased the vehicles at all, or alternatively, would have paid less for them. Plaintiff and the Florida Class members also suffered diminished value of their vehicles, as well as lost or diminished use.

92.      Defendants had an ongoing duty to all customers to refrain from unfair and deceptive practices under the FUDTPA. All owners of Class Vehicles suffered ascertainable loss in the form of the purchase or lease price, as well as the diminished value of their vehicles as a result of Defendants' deceptive and unfair acts and practices.

93.      Plaintiff and the Florida Class members are at risk of irreparable injury as a result of Defendants' acts and omissions in violation of the FUDTPA, and these violations present a

continuing risk to Plaintiff as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

94.     As a direct and proximate result of Defendants' violations of the FUDTPA, Plaintiff and the other Florida Class members have suffered injury-in-fact and/or actual damage.

95.     Plaintiff and the Florida Class members are entitled to recover their actual damages under Fla. Stat. § 501.211(2) and attorneys' fees under Fla. Stat. § 501.2105(1).

96.     Plaintiffs also seek an order enjoining Defendants' unfair, unlawful, and/or deceptive practices, declaratory relief, attorneys' fees, and any other just and proper relief under the FUDTPA.

**FLORIDA COUNT II**
**BREACH OF EXPRESS WARRANTY**
**(F.S.A. §§ 672.313 and 680.21)**

97.     Plaintiff incorporates Paragraphs 1-42 by reference, as though fully set forth here.

98.     Plaintiff brings this Count individually and on behalf of the Florida Class.

99.     The Defendants are and were at all relevant times "merchants" with respect to motor vehicles under F.S.A. §§ 672.104(1) and 680.1031(3)(k), and "sellers" of motor vehicles under § 672.103(1)(d).

100.     With respect to leases, the Defendants are and were at all relevant times "lessors" of motor vehicles under F.S.A. § 680.1031(1)(p).

101.     The Class Vehicles are and were at all relevant times "goods" within the meaning of F.S.A. §§ 672.105(1) and 6701.1031(1)(h).

102.     In connection with the purchase or lease of each one of its new vehicles, the Defendants provide an express New Vehicle Limited Warranty ("NVLW") for a period of four

years or 50,000 miles, whichever occurs first. The NVLW exists to cover any repairs to correct a defect in materials or workmanship.

103.    The Clean Air Act requires manufacturers of light-duty vehicles to provide two federal emission control warranties: a "Performance Warranty" and a "Design and Defect Warranty."

104.    The EPA requires vehicle manufacturers to provide a Performance Warranty with respect to vehicles' emissions systems. Thus, the Defendants also provide an express warranty for its vehicles through a Federal Emissions Performance Warranty. The Performance Warranty required by the EPA applies to repairs that are required during the first two years or 24,000 miles, whichever occurs first, when a vehicle fails an emissions test. Under this warranty, certain major emission control components are covered for the first eight years or 80,000 miles, whichever comes first. These major emission control components subject to the longer warranty include the catalytic converters, the electronic emission control unit, and the onboard emission diagnostic device or computer.

105.    The EPA requires vehicle manufacturers to issue Design and Defect Warranties with respect to their vehicles' emission systems. Thus, the Defendants also provide an express warranty for their vehicles through a Federal Emission Control System Defect Warranty. The Design and Defect Warranty required by the EPA covers repair of emission control or emission related parts which fail to function or function improperly because of a defect in material or workmanship. This warranty provides protection for two years or 24,000 miles, whichever comes first, or, for the major emission control components, for eight years or 80,000 miles, whichever comes first.

106.    As manufacturers of light-duty vehicles, the Defendants were required to provide these warranties to purchasers or lessees of the Class Vehicles.

107.    The Defendants' warranties formed a basis of the bargain that was reached when Plaintiff and the other Florida Class members purchased or leased their Class Vehicles equipped with non-compliant emission systems.

108.    Plaintiff and the Florida Class members experienced defects within the warranty period. Despite the existence of warranties, the Defendants failed to inform Plaintiff and Florida Class members that the Class Vehicles were intentionally designed and manufactured to be out of compliance with applicable state and federal emissions laws, and failed to fix the defective emission components free of charge

109.    Defendants breached the express warranty promising to repair and correct a manufacturing defect or materials or workmanship of any parts they supplied. Defendants have not repaired or adjusted the Class Vehicles' materials and workmanship defects.

110.    Furthermore, the limited warranty promising to repair and/or correct a manufacturing defect fails in its essential purpose because the contractual remedy is insufficient to make Plaintiff and the other Florida Class members whole, and because the Defendants have failed to adequately provide the promised remedies within a reasonable time.

111.    Accordingly, recovery by Plaintiff and the other Florida Class members is not restricted to the limited warranty promising to repair and/or correct a manufacturing defect, and Plaintiff, individually and on behalf of the other Florida Class members, seeks all remedies as allowed by law.

112.    Also, as alleged in more detail herein, at the time the Defendants warranted and sold or leased the Class Vehicles, they knew that the Class Vehicles were illegal and inherently

defective and did not conform to their warranties; further, the Defendants had wrongfully and fraudulently concealed material facts regarding the Class Vehicles. Plaintiff and the other Florida Class members were therefore induced to purchase or lease the Class Vehicles under false and/or fraudulent pretenses.

113.    Moreover, many of the injuries flowing from the Class Vehicles cannot be resolved through the limited remedy of replacements or adjustments, as many incidental and consequential damages have already been suffered because of Defendants' fraudulent conduct as alleged herein, and because of its failure and/or continued failure to provide such limited remedy within a reasonable time, and any limitation on Plaintiff and the other Florida Class members' remedies would be insufficient to make Plaintiff and the other Florida Class members whole.

114.    Finally, because of the Defendants' breach of warranty as set forth herein, Plaintiff and the other Florida Class members assert, as additional and/or alternative remedies, the revocation of acceptance of the goods and the return to Plaintiff and the other Florida Class members of the purchase or lease price of all Class Vehicles currently owned or leased, and for such other incidental and consequential damages as allowed.

115.    The Defendants were, on information and belief, provided notice of these issues through, at the latest, the findings of CARB. Defendants were also provided notice of these issues by a letter from Plaintiffs, sent on November 7, 2016.

116.    As a direct and proximate result of the Defendants' breach of express warranties, Plaintiff and the other Florida Class members have been damaged in an amount to be determined at trial.

## FLORIDA COUNT III
## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### (F.S.A. §§ 672.314 and 680.212)

117.    Plaintiff incorporates Paragraphs 1-42 by reference, as though fully set forth here.

118.    Plaintiff brings this Count individually and on behalf of the Florida Class.

119.    Defendants are and were at all relevant times "merchants" with respect to motor vehicles under F.S.A. §§ 672.104(1) and 680.1031(3)(k), and "sellers" of motor vehicles under § 672.103(1)(d).

120.    With respect to leases, the Defendants are and were at all relevant times "lessors" of motor vehicles under F.S.A. § 680.1031(1)(p).

121.    The Class Vehicles are and were at all relevant times "goods" within the meaning of F.S.A. §§ 672.105(1) and 680.1031(1)(h).

122.    A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to F.S.A. §§ 672.315 and 680.212.

123.    These Class Vehicles, when sold or leased and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which vehicles are used. Specifically, the Class Vehicles are inherently defective in that they do not comply with federal and state emissions standards, and release an unacceptable and dangerous amount of carbon dioxide into the atmosphere.

124.    The Defendants were, on information and belief, provided notice of these issues through, at the latest, the findings of CARB. Defendants were also provided notice of these issues by a letter from Plaintiffs, sent on November 7, 2016.

125.    As a direct and proximate result of the Defendants' breach of the implied warranty of merchantability, Plaintiff and the other Florida Class members have been damaged in an amount to be proven at trial.

## MINNESOTA

### MINNESOTA COUNT I
### VIOLATION OF MINNESOTA PREVENTION OF CONSUMER FRAUD ACT
### (Minn. Stat. § 325f.68, *et seq.*)

126.    Plaintiff Bull (for the purpose of the Minnesota claims, "Plaintiff") incorporates Paragraphs 1-42 by reference, as though fully set forth herein.

127.    Plaintiff brings this action on behalf of herself and the Minnesota Class against all Defendants.

128.    The Class Vehicles constitute "merchandise" within the meaning of Minn. Stat. § 325F.68(2).

129.    The Minnesota Prevention of Consumer Fraud Act ("Minnesota CFA") prohibits "[t]he act, use, or employment by any person of any fraud, false pretense, false promise, misrepresentation, misleading statement or deceptive practice, with the intent that others rely thereon in connection with the sale of any merchandise, whether or not any person has in fact been misled, deceived, or damaged thereby …." Minn. Stat. § 325F.69(1). Defendants participated in misleading, false, or deceptive acts that violated the Minnesota CFA.

130.    In the course of their business, Defendants concealed and suppressed material facts concerning the Class Vehicles. Defendants accomplished this by installing illegal defeat device software in the Class Vehicles that caused the vehicles to operate in a low emission test mode only during emissions testing. During normal operations, the Class Vehicles would emit

28

significantly larger quantities of carbon dioxide. The result was what Defendants intended—the Class Vehicles passed emissions testing by way of deliberately induced false readings. Plaintiff and Minnesota Class members had no way of discerning that Defendants representations were false and misleading because Defendants' defeat device software was extremely sophisticated technology that would not be evident to an ordinary consumer.

131.    Defendants concealed the existence of the defeat device from Plaintiff and the other Minnesota Class members, as well as the fact that the Class Vehicles do not operate within legal emission levels during normal operation. Defendants concealed these facts with the intention that Plaintiff and the Minnesota Class members would rely thereon

132.    Defendants thus violated the Minnesota CFA by, at minimum employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of Class Vehicles.

133.    Defendants' actions as set forth above occurred in the conduct of trade or commerce.

134.    Defendants engaged in misleading, false, unfair or deceptive acts or practices that violated the Minnesota CFA by installing, failing to disclose and actively concealing the illegal defeat device and the true cleanliness and performance of Class Vehicles' engine system, and by marketing their vehicles as legal, reliable, environmentally clean, efficient, and of high quality.

135.    The Clean Air Act and EPA regulations require that automobiles limit their emissions output to specified levels. These laws are intended for the protection of public health and welfare. "Defeat devices" like those in the Class Vehicles are defined and prohibited by the

136.    Clean Air Act and its regulations. See 42 U.S.C. § 7522(a)(3)(B); 40 CFR § 86.1809. By installing illegal "defeat devices" in the Class Vehicles and by making those vehicles available for purchase, Defendants violated federal law and therefore engaged in conduct that violates the Minnesota CFA.

137.    Defendants intentionally and knowingly misrepresented material facts regarding the Class Vehicles with intent to mislead Plaintiff and the Minnesota Class.

138.    Defendants knew or should have known that its conduct violated the Minnesota CFA.

139.    Defendants owed Plaintiff a duty to disclose the illegality and public health and safety risks of the Class Vehicles because they:

a. possessed exclusive knowledge that they were manufacturing, selling, and distributing vehicles throughout the United States that did not comply with EPA regulations;

b. intentionally concealed the foregoing from regulators, Plaintiff, Class members; and/or

c. made incomplete representations about the environmental cleanliness and efficiency of the Class Vehicles generally, and the use of the defeat device in particular, while purposefully withholding material facts from Plaintiff that contradicted these representations.

140.    Defendants' supply and use of the illegal defeat device and concealment of the true characteristics of the Class Vehicles were material to Plaintiff and the Minnesota Class.

141.    Defendants' unfair or deceptive acts or practices were likely to and did in fact deceive regulators and reasonable consumers, including Plaintiff, about the true environmental cleanliness and efficiency of Class Vehicles and the true value of the Class Vehicles.

142.    Plaintiff and the Minnesota Class suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' misrepresentations and its concealment of and

failure to disclose material information. Plaintiff and the Minnesota Class members who purchased or leased the Class Vehicles would not have purchased or leased them at all and/or—if the Vehicles' true nature had been disclosed and mitigated, and the Vehicles rendered legal to sell—would have paid significantly less for them. Plaintiff and the Minnesota Class members also suffered diminished value of their vehicle, as well as lost or diminished use.

143.    Defendants had an ongoing duty to all customers to refrain from unfair and deceptive practices under the Minnesota CFA. All owners of Class Vehicles suffered ascertainable loss in the form of the diminished value of their vehicles as a result of Defendants' deceptive and unfair acts and practices.

144.    Defendants' violations present a continuing risk to Plaintiff as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

145.    As a direct and proximate result of Defendants' violations of the Minnesota CFA, Plaintiff and the Minnesota Class have suffered injury-in-fact and/or actual damage.

146.    Pursuant to Minn. Stat. § 8.31(3a), Plaintiff and the Minnesota Class seek actual damages, attorneys' fees, and any other just and proper relief available under the Minnesota CFA.

147.    Plaintiff also seeks punitive damages under Minn. Stat. § 549.20(1)(a) given the clear and convincing evidence that Defendants' acts show deliberate disregard for the rights or safety of others.

**MINNESOTA COUNT II**
**VIOLATIONS OF MINNESOTA UNIFORM DECEPTIVE TRADEPRACTICES ACT**
**(Minn. Stat. § 325d.43-48, *et seq.*)**

148.    Plaintiff incorporates Paragraphs 1-42 by reference, as though fully set forth herein.

149.    Plaintiff brings this Count on behalf of herself and the Minnesota Class.

150.    The Minnesota Deceptive Trade Practices Act ("Minnesota DTPA") prohibits deceptive trade practices, which occur when a person "(5) represents that goods or services have sponsorship, approval characteristics, ingredients, uses, benefits, or quantities that the person does not have;" "(7) represents that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or mode, if they are of another;" and "(9) advertises goods or services with intent not to sell them as advertised." Minn. State. § 325D.44. In the course of Defendants' business, they engaged in deceptive practices by representing that Class Vehicles have sponsorship, approval, characteristics, ingredients, uses, benefits, or qualities that they do not have; representing that Class Vehicles are of a particular standard, quality, or grade, when they are of another; and advertising Class Vehicles with intent not to sell them as advertised. Defendants participated in misleading, false, or deceptive acts that violated the Minnesota DTPA.

151.    By failing to disclose and by actively concealing the defeat device and the true nature of the emissions of the Class Vehicles; and by marketing their vehicles as safe, reliable, environmentally clean, efficient, and of high quality, Defendants engaged in deceptive business practices prohibited by the Minnesota DPTA.

152.    Defendants' actions as set forth above occurred in the conduct of trade or commerce.

153.    In the course of their business, Defendants willfully failed to disclose and actively concealed the illegal defeat device and the true nature of the Class Vehicles' emissions. Defendants also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of Class Vehicles.

154.    Defendants' actions as set forth above occurred in the conduct of trade or commerce.

155.    The Clean Air Act and EPA regulations require that automobiles limit their emissions output to specified levels. These laws are intended for the protection of public health and welfare. "Defeat devices" like those in the Class Vehicles are defined and prohibited by the Clean Air Act and its regulations. See 42 U.S.C. § 7522(a)(3)(B); 40 CFR §86.1809. By supplying and installing illegal "defeat devices" in the Class Vehicles and by making those vehicles available for purchase equipped with the defeat devices, Defendants violated federal law and therefore engaged in conduct that violates the Minnesota DTPA.

156.    Defendants knew the true nature of the Class Vehicles' emissions and knew that they did not comply with EPA regulations, but concealed that information.

157.    Defendants intentionally and knowingly misrepresented material facts regarding the Class Vehicles with intent to mislead Plaintiff and the Minnesota Class.

158.    Defendants knew or should have known that their conduct violated the Minnesota DTPA.

159.    Defendants owed Plaintiff and the Minnesota Class a duty to disclose the illegality and public health and safety risks of the Class Vehicles because they:

a.      possessed exclusive knowledge that they were manufacturing, selling, and distributing vehicles throughout the United States that did not comply with EPA regulations;

b.      intentionally concealed the foregoing from regulators, Plaintiff, Minnesota Class members; and/or

c.      made incomplete representations about the environmental cleanliness and efficiency of the Class Vehicles generally, and the use of the defeat device in particular, while purposefully withholding material facts from Plaintiff that contradicted these representations.

160.    Defendants supply and use of the illegal defeat device and concealment of the true characteristics of the Class Vehicles' emissions were material to Plaintiff and the Minnesota Class.

161.    Defendants' unfair or deceptive acts or practices were likely to and did, in fact, deceive regulators and reasonable consumers, including Plaintiff, about the true environmental cleanliness and efficiency of the Class Vehicles and the true value of the Class Vehicles.

162.    Plaintiff and the Minnesota Class suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' misrepresentations and their concealment of and failure to disclose material information. Plaintiff and the Minnesota Class members who purchased or leased the Class Vehicles would not have purchased or leased them at all, or would have paid significantly less for them, had the Class Vehicles' true nature been disclosed.

163.    Defendants had an ongoing duty to all customers to refrain from unfair and deceptive practices under the Minnesota DTPA. All owners of Class Vehicles suffered ascertainable loss in the form of the diminished value of their vehicles as a result of Defendants' deceptive and unfair acts and practices.

164.    Defendants' violations present a continuing risk to Plaintiff as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

165.    As a direct and proximate result of Defendants' violations of the Minnesota DTPA, Plaintiff and the Minnesota Class have suffered injury-in-fact and/or actual damage.

166.    Pursuant to Minn. Stat. § 8.31(a) and 325D.45, Plaintiff and the Minnesota Class seek actual damages, attorneys' fees, and any other just and proper relief available under the Minnesota DTPA.

167.    Plaintiffs also seek punitive damages under Minn. Stat. § 549.20(1)(a) given Defendants deliberate disregard for the rights or safety of others.

### MINNESOTA COUNT III
### BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### (Minn. Stat. §§ 336.2-314 and 336.2A-212)

168.    Plaintiff incorporates Paragraphs 1-42 by reference, as though fully set forth herein.

169.    Plaintiff brings this Count on behalf of herself and the Minnesota Class.

170.    Defendants are and were at all relevant times "merchants" with respect to motor vehicles under Minn. Stat. § 336.2-104(1) and "sellers" of motor vehicles under § 336.2-103(1)(d).

171.    With respect to leases, Defendants are and were at all relevant times "lessors" of motor vehicles under Minn. Stat. § 336.2A-103(1)(p).

172.    The Class Vehicles are and were at all relevant times "goods" within the meaning of Minn. Stat. § 336.2-105(1) and 336.2A-103(1)(h).

173.    A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Minn. Stat. §§ 336.2-314 and 336.2A-212.

174.    These Class Vehicles, when sold or leased and at all times hereafter, were not in merchantable condition and are not fit for the ordinary purpose for which vehicles are used. Specifically, the Class Vehicles contain an illegal defeat device; are inherently defective in that they do not comply with federal and state emissions standards, rendering certain emissions functions inoperative; and the emissions systems were not adequately designed, manufactured, or tested.

175.    The Defendants were, on information and belief, provided notice of these issues through, at the latest, the findings of CARB. Defendants also were provided notice of these issues by a letter from Plaintiffs, sent on November 7, 2016. .

176.    As a direct and proximate result of Defendants' breach of the implied warranty of merchantability, Plaintiff and the other Minnesota Class members have been damaged in an amount to be proven at trial.

**MINNESOTA COUNT IV**
**BREACH OF EXPRESS WARRANTY**
**(Minn. Stat. §§ 336.2-313 and 336.2A-210)**

177.    Plaintiff incorporates Paragraphs 1-42 by reference, as though fully set forth herein as though fully set forth herein.

178.    Plaintiff brings this Count on behalf of herself and the Minnesota class.

179.    Defendants are and were at all relevant times "merchants" with respect to motor vehicles under Minn. Stat. § 336.2-104(1) and "sellers" of motor vehicles under § 336.2-103(1)(d).

180.    With respect to leases, Defendants are and were at all relevant times "lessors" of motor vehicles under Minn. Stat. § 336.2A-103(1)(p).

181.    The Class Vehicles are and were at all relevant times "goods" within the meaning of Minn. Stat. §§ 336.2-105(1) and 336.2A-103(1)(h).

182.    In connection with the purchase or lease of each one of its new vehicles, Defendants provide a New Vehicle Limited Warranty ("NVLW") for a period of four years or 50,000 miles, whichever occurs first. The NVLW exists to cover any repairs to correct a defect in materials or workmanship.

183.    The Clean Air Act requires manufacturers of light-duty vehicles to provide two federal emission control warranties: a "Performance Warranty" and a "Design and Defect Warranty."

184.    The EPA requires vehicle manufacturers to provide a Performance Warranty with respect to vehicles' emissions systems. Thus, the Defendants also provide an express warranty for its vehicles through a Federal Emissions Performance Warranty. The Performance Warranty required by the EPA applies to repairs that are required during the first two years or 24,000 miles, whichever occurs first, when a vehicle fails an emissions test. Under this warranty, certain major emission control components are covered for the first eight years or 80,000 miles, whichever comes first. These major emission control components subject to the longer warranty include the catalytic converters, the electronic emission control unit, and the onboard emission diagnostic device or computer.

185.    The EPA requires vehicle manufacturers to issue Design and Defect Warranties with respect to their vehicles' emission systems. Thus, the Defendants also provide an express warranty for their vehicles through a Federal Emission Control System Defect Warranty. The

Design and Defect Warranty required by the EPA covers repair of emission control or emission related parts which fail to function or function improperly because of a defect in material or workmanship. This warranty provides protection for two years or 24,000 miles, whichever comes first, or, for the major emission control components, for eight years or 80,000 miles, whichever comes first.

186.    As manufacturers of light-duty vehicles, the Defendants were required to provide these warranties to purchasers or lessees of the Class Vehicles.

187.    The Defendants' warranties formed a basis of the bargain that was reached when Plaintiff and the other Minnesota Class members purchased or leased their Class Vehicles equipped with non-compliant emission systems.

188.    Plaintiff and the Minnesota Class members experienced defects within the warranty period. Despite the existence of warranties, the Defendants failed to inform Plaintiff and Minnesota Class members that the Class Vehicles were intentionally designed and manufactured to be out of compliance with applicable state and federal emissions laws, and failed to fix the defective emission components free of charge.

189.    Defendants breached the express warranty promising to repair and correct a manufacturing defect or materials or workmanship of any parts they supplied. Defendants have not repaired or adjusted the Class Vehicles' materials and workmanship defects.

190.    Furthermore, the limited warranty promising to repair and/or correct a manufacturing defect fails in its essential purpose because the contractual remedy is insufficient to make Plaintiff and the other Minnesota Class members whole, and because the Defendants have failed to adequately provide the promised remedies within a reasonable time.

191.    Accordingly, recovery by Plaintiff and the other Minnesota Class members is not restricted to the limited warranty promising to repair and/or correct a manufacturing defect, and Plaintiff, individually and on behalf of the other Minnesota Class members, seeks all remedies as allowed by law.

192.    Also, as alleged in more detail herein, at the time the Defendants warranted and sold or leased the Class Vehicles, they knew that the Class Vehicles were illegal and inherently defective and did not conform to their warranties; further, the Defendants had wrongfully and fraudulently concealed material facts regarding the Class Vehicles. Plaintiff and the other Minnesota Class members were therefore induced to purchase or lease the Class Vehicles under false and/or fraudulent pretenses.

193.    Moreover, many of the injuries flowing from the Class Vehicles cannot be resolved through the limited remedy of replacements or adjustments, as many incidental and consequential damages have already been suffered because of Defendants' fraudulent conduct as alleged herein, and because of its failure and/or continued failure to provide such limited remedy within a reasonable time, and any limitation on Plaintiff and the other Minnesota Class members' remedies would be insufficient to make Plaintiff and the other Minnesota Class members whole.

194.    Finally, because of the Defendants' breach of warranty as set forth herein, Plaintiff and the other Minnesota Class members assert, as additional and/or alternative remedies, the revocation of acceptance of the goods and the return to Plaintiff and the other Minnesota Class members of the purchase or lease price of all Class Vehicles currently owned or leased, and for such other incidental and consequential damages as allowed.

195.    The Defendants were, on information and belief, provided notice of these issues through, at the latest, the findings of CARB. Defendants also were provided notice of these issues by a letter from Plaintiffs, sent on November 7, 2016.

196.    As a direct and proximate result of the Defendants' breach of express warranties, Plaintiff and the other Minnesota Class members have been damaged in an amount to be determined at trial.

## MISSOURI

### MISSOURI COUNT I
### VIOLATIONS OF MISSOURI MERCHANDISING PRACTICES ACT
### (Mo. Rev. Stat. § 407.010, *et seq.*)

197.    Plaintiff Gutzler (for the purpose of the Missouri claims, "Plaintiff") incorporates Paragraphs 1-42 by reference, as though fully set forth herein.

198.    Plaintiff brings this action on behalf of herself and the Missouri Class.

199.    Defendants, Plaintiff and the members of the Missouri Class are "persons" within the meaning of Mo. Rev. Stat. § 407.010(7).

200.    The Missouri Merchandising Practices Act ("Missouri MPA") makes unlawful the "act, use or employment by any person of any deception, fraud, false pretense, misrepresentation, unfair practice, or the concealment, suppression, or omission of any material fact in connection with the sale or advertisement of any merchandise." Mo. Rev. Stat. § 407.020.

201.    In the course of their business, Defendants concealed and suppressed material facts concerning the Class Vehicles. Defendants accomplished this by installing illegal defeat devices in the Class Vehicles that cause the vehicles to operate in a low emission test mode only during emissions testing. During normal operations, the Class Vehicles would emit significantly larger quantities of carbon dioxide. The result was what Defendants intended—the Class

40

Vehicles passed emissions testing by way of deliberately induced false readings. Defendants concealed the existence of the illegal defeat device from Plaintiff and the Missouri Class members, as well as the fact that the Class Vehicles did not operate within legal emissions levels during normal operation. Plaintiff and other Missouri Class members had no way of discerning these facts, and that Defendants representations concerning the vehicles emissions levels were false and misleading, because Defendants' defeat device software was extremely sophisticated technology that would not be evident to an ordinary consumer.

202.    By failing to disclose these defects or facts about the defects described herein, which defects were known to Defendants, Defendants deprived consumers of all material facts about the safety and functionality of their vehicles. By failing to release material facts about the defect, Defendants curtailed or reduced the ability of consumers to take notice of material facts about their vehicles, and/or affirmatively operated to hide or keep those facts from consumers. 15 Mo. Code of State Reg. § 60-9.110. Moreover, Defendants have otherwise engaged in activities with a tendency or capacity to deceive. Defendants have engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, unfair practices, and/or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of Class Vehicles.

203.    In the course of Defendants' business, Defendants engaged in misleading, false, unfair or deceptive acts or practices that violated Missouri law by installing, failing to disclose and actively concealing the illegal defeat device and the true cleanliness and performance of the Class Vehicles; and by marketing the Class Vehicles as legal, reliable, environmentally clean, efficient, and of high quality.

204.    The Clean Air Act and EPA regulations require that automobiles limit their emissions output to specified levels. These laws are intended for the protection of public health and welfare. "Defeat devices" like those in the Class Vehicles are defined and prohibited by the Clean Air Act and its regulations. See 42 U.S.C. § 7522(a)(3)(B); 40 CFR §86.1809. By supplying and installing illegal "defeat devices" in the Class Vehicles and by making those vehicles available for purchase equipped with the defeat devices, Defendants violated federal law and therefore engaged in conduct that violates the Missouri law.

205.    Defendants knew the true nature of the Class Vehicles' emissions and knew that they did not comply with EPA regulations, but concealed that information.

206.    Defendants intentionally and knowingly misrepresented material facts regarding the Class Vehicles with intent to mislead Plaintiff and the Missouri Class, including without limitation by failing to disclose the defects in light of circumstances under which the omitted facts were necessary in order to correct the representations being made by Defendants about the environmental cleanliness and efficiency of their vehicles. Consequently, the failure to disclose such facts amounts to misleading statements pursuant to 15 Mo. Code of State Reg. § 60-9.090.

207.    Defendants' conduct as described herein is unethical, oppressive or unscrupulous and/or it presented a risk of substantial injury to consumers. Such acts are unfair practices in violation of 15 Mo. Code of state Reg. § 60-8.020.

208.    Defendants knew or should have known that their conduct violated the Missouri MPA.

209.    Defendants owed Plaintiff a duty to disclose the illegality and public health and safety risks of the Class Vehicles because they:

a.    possessed exclusive knowledge that they were manufacturing, selling, and distributing vehicles throughout the United States that did not comply with EPA and state emissions regulations;

b.    intentionally concealed the foregoing from regulators, Plaintiff, and Missouri Class members, and/or;

c.    made incomplete representations about the illegality, emissions, and efficiency of the Class Vehicles generally, and the use of the defeat device in particular, while purposefully withholding material facts from Plaintiffs that contradicted these representations.

210.    Defendants supply and use of the illegal defeat device and concealment of the true characteristics of the Class Vehicles' emissions systems were material to Plaintiff and the Missouri Class.

211.    Defendants' unfair or deceptive acts or practices were likely to and did in fact deceive regulators and reasonable consumers, including Plaintiff, about the true environmental cleanliness and efficiency, and true value, of the Class Vehicles.

212.    Plaintiff and the Missouri Class suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' misrepresentations and their concealment of and failure to disclose material information. Plaintiff and the Missouri Class members who purchased or leased the Class Vehicles would not have purchased or leased them at all, or would have paid significantly less for them, had the true nature of the Class Vehicles been disclosed and mitigated. Plaintiff and Missouri Class members also suffered diminished value of their vehicles, as well as lost or diminished use.

213.    Defendants had an ongoing duty to all their customers to refrain from unfair and deceptive practices under the Missouri MPA. All owners of Class Vehicles suffered ascertainable loss in the form of the diminished value of their vehicles as a result of Defendants' deceptive and unfair acts and practices.

214.     Defendants' violations present a continuing risk to Plaintiff, as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

215.     As a direct and proximate result of Defendants' violations of the Missouri MPA, Plaintiff and the Missouri Class have suffered injury-in-fact and/or actual damage.

216.     Defendants are liable to Plaintiff and the Missouri Class for damages in amounts to be proven at trial, including attorneys' fees, costs, and punitive damages, as well as injunctive relief enjoining Defendants' unfair and deceptive practices, and any other just and proper relief under Mo. Rev. Stat. § 407.025.

## MISSOURI COUNT II
## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### (Mo. Stat. §§ 400.2-314 and 400.2A-212)

217.     Plaintiff incorporates Paragraphs 1-42 by reference, as though fully set forth herein.

218.     Plaintiff brings this Count on behalf of herself and the Missouri Class.

219.     Defendants are and were at all relevant times "merchants" with respect to motor vehicles under Mo. Stat. § 400.2-104(1) and "sellers" of motor vehicles under § 400.2-103(1)(d).

220.     With respect to leases, Defendants are and were at all relevant times "lessors" of motor vehicles under Mo. Stat. § 400.2A-103(1)(p).

221.     The Class Vehicles are and were at all relevant times "goods" within the meaning of Mo. Stat. § 40.2-105(1) and Mo. Stat. § 40.2A-103(1)(h).

222.    A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied in law pursuant to Mo. Stat. § 400.2-314 and Mo. Stat. § 400.2A-212.

223.    These Class Vehicles, when sold or leased and at all times hereafter, were not in merchantable condition and are not fit for the ordinary purpose for which vehicles are used. Specifically, the Class Vehicles are inherently defective in that they do not comply with federal and state emissions standards, rendering certain emissions functions inoperative; and the emissions systems were not adequately designed, manufactured, or tested.

224.    The Defendants were, on information and belief, provided notice of these issues, at the latest, through the findings of CARB. Defendants were also provided notice of these issues by a letter from Plaintiffs, sent on November 7, 2016.

225.    As a direct and proximate result of Defendants' breach of the implied warranty of merchantability, Plaintiff and the other Missouri Class members have been damaged in an amount to be proven at trial.

## MISSOURI COUNT III
## BREACH OF EXPRESS WARRANTY
### (Mo. Stat. §§ 400.2-313 and 400.2A-210)

226.    Plaintiff incorporates Paragraphs 1-42 by reference, as though fully set forth herein.

227.    Plaintiff brings this Count on behalf of herself and the Missouri class.

228.    Defendants are and were at all relevant times "merchants" with respect to motor vehicles under Mo. Stat. § 400.2-104(1) and "sellers" of motor vehicles under § 400.2-103(1)(d).

229.    With respect to leases, Defendants are and were at all relevant times "lessors" of motor vehicles under Mo. Stat. § 400.2A-103(1)(p).

230.    The Class Vehicles are and were at all relevant times "goods" within the meaning of Mo. Stat. § 400.2-105(1) and Mo. Stat. § 400.2A-103(1)(h).

231.    In connection with the purchase or lease of each one of its new vehicles, Defendants provide a New Vehicle Limited Warranty ("NVLW") for a period of four years or 50,000 miles, whichever occurs first. The NVLW exists to cover any repairs to correct a defect in materials or workmanship.

232.    The Clean Air Act requires manufacturers of light-duty vehicles to provide two federal emission control warranties: a "Performance Warranty" and a "Design and Defect Warranty."

233.    The EPA requires vehicle manufacturers to provide a Performance Warranty with respect to vehicles' emissions systems. Thus, the Defendants also provide an express warranty for its vehicles through a Federal Emissions Performance Warranty. The Performance Warranty required by the EPA applies to repairs that are required during the first two years or 24,000 miles, whichever occurs first, when a vehicle fails an emissions test. Under this warranty, certain major emission control components are covered for the first eight years or 80,000 miles, whichever comes first. These major emission control components subject to the longer warranty include the catalytic converters, the electronic emission control unit, and the onboard emission diagnostic device or computer.

234.    The EPA requires vehicle manufacturers to issue Design and Defect Warranties with respect to their vehicles' emission systems. Thus, the Defendants also provide an express warranty for their vehicles through a Federal Emission Control System Defect Warranty. The Design and Defect Warranty required by the EPA covers repair of emission control or emission related parts which fail to function or function improperly because of a defect in material or

workmanship. This warranty provides protection for two years or 24,000 miles, whichever comes first, or, for the major emission control components, for eight years or 80,000 miles, whichever comes first.

235. As manufacturers of light-duty vehicles, the Defendants were required to provide these warranties to purchasers or lessees of the Class Vehicles.

236. The Defendants' warranties formed a basis of the bargain that was reached when Plaintiff and the other Missouri Class members purchased or leased their Class Vehicles equipped with non-compliant emission systems.

237. Plaintiff and the Missouri Class members experienced defects within the warranty period. Despite the existence of warranties, the Defendants failed to inform Plaintiff and Missouri Class members that the Class Vehicles were intentionally designed and manufactured to be out of compliance with applicable state and federal emissions laws, and failed to fix the defective emission components free of charge

238. Defendants breached the express warranty promising to repair and correct a manufacturing defect or materials or workmanship of any parts they supplied. Defendants have not repaired or adjusted the Class Vehicles' materials and workmanship defects.

239. Furthermore, the limited warranty promising to repair and/or correct a manufacturing defect fails in its essential purpose because the contractual remedy is insufficient to make Plaintiff and the other Missouri Class members whole, and because the Defendants have failed to adequately provide the promised remedies within a reasonable time.

240. Accordingly, recovery by Plaintiff and the other Missouri Class members is not restricted to the limited warranty promising to repair and/or correct a manufacturing defect, and

Plaintiff, individually and on behalf of the other Missouri Class members, seeks all remedies as allowed by law.

241.    Also, as alleged in more detail herein, at the time the Defendants warranted and sold or leased the Class Vehicles, they knew that the Class Vehicles were illegal and inherently defective and did not conform to their warranties; further, the Defendants had wrongfully and fraudulently concealed material facts regarding the Class Vehicles. Plaintiff and the other Missouri Class members were therefore induced to purchase or lease the Class Vehicles under false and/or fraudulent pretenses.

242.    Moreover, many of the injuries flowing from the Class Vehicles cannot be resolved through the limited remedy of replacements or adjustments, as many incidental and consequential damages have already been suffered because of Defendants' fraudulent conduct as alleged herein, and because of its failure and/or continued failure to provide such limited remedy within a reasonable time, and any limitation on Plaintiff and the other Missouri Class members' remedies would be insufficient to make Plaintiff and the other Missouri Class members whole.

243.    Finally, because of the Defendants' breach of warranty as set forth herein, Plaintiff and the other Missouri Class members assert, as additional and/or alternative remedies, the revocation of acceptance of the goods and the return to Plaintiff and the other Missouri Class members of the purchase or lease price of all Class Vehicles currently owned or leased, and for such other incidental and consequential damages as allowed.

244.    The Defendants were, on information and belief, provided notice of these issues, at the latest, through the findings of CARB. Defendants were also provided notice of these issues by a letter from Plaintiffs, sent on November 7, 2016.

245.    As a direct and proximate result of the Defendants' breach of express warranties, Plaintiff and the other Missouri Class members have been damaged in an amount to be determined at trial.

**PENNSYLVANIA**

**PENNSYLVANIA COUNT I**
**VIOLATIONS OF THE PENNSYLVANIA UNFAIR TRADE PRACTICS AND**
**CONSUMER PROTECTION LAW**
**(73 P.S. § 201-1 *et seq.*)**

246.    Plaintiff Sheller (for the purpose of the Pennsylvania claims, "Plaintiff") incorporates Paragraphs 1-42 by reference, as though fully set forth herein.

247.    Plaintiff brings this Count on behalf of herself and the Pennsylvania Class.

248.    Defendants, Plaintiff, and the Pennsylvania Class are "persons" within the meaning of 73 P.S. § 201-2(2).

249.    Defendants are engaged in "trade" or "commerce" within the meaning of 73 P.S. § 201-2(3).

250.    The Pennsylvania Unfair Trade Practices Act ("Pennsylvania UTPA") prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce . . . ." 73 P.S. § 201-3.

251.    In the course of their business, Defendants intentionally concealed and suppressed material facts concerning the Class Vehicles. Defendants accomplished this by installing illegal defeat device software in the Class Vehicles that caused the vehicles to operate in a low emission test mode only during emissions testing. During normal operations, the Class Vehicles would emit significantly larger quantities of carbon dioxide. The result was what Defendants intended—the Class Vehicles passed emissions testing by way of deliberately induced false readings. Defendants concealed the existence of the defeat device, and the fact that the Class

Vehicles do not operate within legal emissions levels during normal use, from Plaintiff and the Pennsylvania Class members. Plaintiff and Pennsylvania Class members had no way of discerning that Defendants representations were false and misleading because Defendants' defeat device software was extremely sophisticated technology that would not be evident to an ordinary consumer.

252.    Defendants violated the Pennsylvania UTPA by, at minimum, employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of Class Vehicles.

253.    Defendants engaged in misleading, false, unfair or deceptive acts or practices that violated the Pennsylvania UTPA by installing, failing to disclose and actively concealing the illegal defeat device and the true cleanliness and performance of Class Vehicles' engine system, and by marketing their vehicles as legal, reliable, environmentally clean, efficient, and of high quality.

254.    Defendants intentionally and knowingly misrepresented material facts regarding the Class Vehicles with intent to mislead Plaintiff and the Pennsylvania Class.

255.    Defendants knew or should have known that its conduct violated the Pennsylvania UTPA.

256.    Defendants owed Plaintiff and Pennsylvania Class members a duty to disclose the illegality and public health and safety risks of the Class Vehicles because they:

    a. possessed exclusive knowledge that they were manufacturing, selling, and distributing vehicles throughout the United States that did not comply with EPA regulations;

    b. intentionally concealed the foregoing from regulators, Plaintiff, Pennsylvania Class members; and/or

c. made incomplete representations about the environmental cleanliness and efficiency of the Class Vehicles generally, and the use of the defeat device in particular, while purposefully withholding material facts from Plaintiff that contradicted these representations.

257.    Defendants' supply and use of the illegal defeat device and concealment of the true characteristics of the Class Vehicles were material to Plaintiffs and the Pennsylvania Class.

258.    Defendants' unfair or deceptive acts or practices were likely to and did in fact deceive regulators and reasonable consumers, including Plaintiff, about the true environmental cleanliness and efficiency of Class Vehicles and the true value of the Class Vehicles.

259.    Plaintiff and the Pennsylvania Class suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' misrepresentations and its concealment of and failure to disclose material information. Plaintiff and the Pennsylvania Class members who purchased or leased the Class Vehicles would not have purchased or leased them at all and/or—if the Vehicles' true nature had been disclosed and mitigated, and the Vehicles rendered legal to sell—would have paid significantly less for them. Plaintiff and the Pennsylvania Class members also suffered diminished value of their vehicle, as well as lost or diminished use.

260.    Defendants had an ongoing duty to all customers to refrain from unfair and deceptive practices under the Pennsylvania UTPA. All owners of Class Vehicles suffered ascertainable loss in the form of the diminished value of their vehicles as a result of Defendants' deceptive and unfair acts and practices.

261.    Defendants' violations present a continuing risk to Plaintiff as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

262.    Pursuant to 73 P.S. § 201-9.2(a), Plaintiff and the Pennsylvania Class seek an order enjoining Defendants' unfair and/or deceptive acts or practices, damages – trebled, punitive damages, and attorneys' fees, costs, and any other just and proper relief available under the Pennsylvania UTPA.

## PENNSYLVANIA COUNT II
## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### (13 Pa. Cons. Stat. §§ 2314 and 2A212)

263.    Plaintiff incorporates Paragraphs 1-42 by reference, as though fully set forth herein.

264.    Plaintiff brings this Count on behalf of herself and the Pennsylvania Class.

265.    Defendants are and were at all relevant times "merchants" with respect to motor vehicles under 13 Pa. Cons. Stat. §§ 2104 and 2A103(a), and "sellers" of motor vehicles under § 2103(a).

266.    With respect to leases, Defendants are and were at all relevant times "lessors" of motor vehicles under 13 Pa. Cons. Stat. § 2A103(a)

267.    The Class Vehicles are and were at all relevant times "goods" within the meaning of 13 Pa. Cons. Stat. §§ 2105(a) and 2A103(a).

268.    A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied in law pursuant to 13 Pa. Cons. Stat. §§ 2314 and 2A212.

269.    These Class Vehicles, when sold or leased and at all times hereafter, were not in merchantable condition and are not fit for the ordinary purpose for which vehicles are used. Specifically, the Class Vehicles are inherently defective in that they do not comply with federal

and state emissions standards, rendering certain emissions functions inoperative; and the emissions systems were not adequately designed, manufactured, or tested.

270.    The Defendants were, on information and belief, provided notice of these issues through, at the latest, the findings of CARB. Defendants were also provided notice of these issues by a letter from Plaintiffs, sent on November 7, 2016.

271.    As a direct and proximate result of Defendants' breach of the implied warranty of merchantability, Plaintiff and the other Pennsylvania Class members have been damaged in an amount to be proven at trial.

**PENNSYLVANIA COUNT II**
**BREACH OF EXPRESS WARRANTY**
**(13 Pa. Cons. Stat. §§ 2313 and 2A210)**

272.    Plaintiff incorporates Paragraphs 1-42 by reference, as though fully set forth herein.

273.    Plaintiff brings this Count on behalf of herself and the Pennsylvania Class.

274.    Defendants are and were at all relevant times "merchants" with respect to motor vehicles under 13 Pa. Cons. Stat. §§ 2104 and 2A103(a), and "sellers" of motor vehicles under § 2103(a).

275.    With respect to leases, Defendants are and were at all relevant times "lessors" of motor vehicles under 13 Pa. Cons. Stat. § 2A103(a).

276.    The Class Vehicles are and were at all relevant times "goods" within the meaning of 13 Pa. Cons. Stat. §§ 2105(a), and 2A103(a)

277.    In connection with the purchase or lease of each one of its new vehicles, Defendants provide a New Vehicle Limited Warranty ("NVLW") for a period of four years or

50,000 miles, whichever occurs first. The NVLW exists to cover any repairs to correct a defect in materials or workmanship.

278.    The Clean Air Act requires manufacturers of light-duty vehicles to provide two federal emission control warranties: a "Performance Warranty" and a "Design and Defect Warranty."

279.    The EPA requires vehicle manufacturers to provide a Performance Warranty with respect to vehicles' emissions systems. Thus, the Defendants also provide an express warranty for its vehicles through a Federal Emissions Performance Warranty. The Performance Warranty required by the EPA applies to repairs that are required during the first two years or 24,000 miles, whichever occurs first, when a vehicle fails an emissions test. Under this warranty, certain major emission control components are covered for the first eight years or 80,000 miles, whichever comes first. These major emission control components subject to the longer warranty include the catalytic converters, the electronic emission control unit, and the onboard emission diagnostic device or computer.

280.    The EPA requires vehicle manufacturers to issue Design and Defect Warranties with respect to their vehicles' emission systems. Thus, the Defendants also provide an express warranty for their vehicles through a Federal Emission Control System Defect Warranty. The Design and Defect Warranty required by the EPA covers repair of emission control or emission related parts which fail to function or function improperly because of a defect in material or workmanship. This warranty provides protection for two years or 24,000 miles, whichever comes first, or, for the major emission control components, for eight years or 80,000 miles, whichever comes first.

281.    As manufacturers of light-duty vehicles, the Defendants were required to provide these warranties to purchasers or lessees of the Class Vehicles.

282.    The Defendants' warranties formed a basis of the bargain that was reached when Plaintiff and the other Pennsylvania Class members purchased or leased their Class Vehicles equipped with non-compliant emission systems.

283.    Plaintiff and the Pennsylvania Class members experienced defects within the warranty period. Despite the existence of warranties, the Defendants failed to inform Plaintiff and Pennsylvania Class members that the Class Vehicles were intentionally designed and manufactured to be out of compliance with applicable state and federal emissions laws, and failed to fix the defective emission components free of charge

284.    Defendants breached the express warranty promising to repair and correct a manufacturing defect or materials or workmanship of any parts they supplied. Defendants have not repaired or adjusted the Class Vehicles' materials and workmanship defects.

285.    Furthermore, the limited warranty promising to repair and/or correct a manufacturing defect fails in its essential purpose because the contractual remedy is insufficient to make Plaintiff and the other Pennsylvania Class members whole, and because the Defendants have failed to adequately provide the promised remedies within a reasonable time.

286.    Accordingly, recovery by Plaintiff and the other Pennsylvania Class members is not restricted to the limited warranty promising to repair and/or correct a manufacturing defect, and Plaintiff, individually and on behalf of the other Pennsylvania Class members, seeks all remedies as allowed by law.

287.    Also, as alleged in more detail herein, at the time the Defendants warranted and sold or leased the Class Vehicles, they knew that the Class Vehicles were illegal and inherently

defective and did not conform to their warranties; further, the Defendants had wrongfully and fraudulently concealed material facts regarding the Class Vehicles. Plaintiff and the other Pennsylvania Class members were therefore induced to purchase or lease the Class Vehicles under false and/or fraudulent pretenses.

288.    Moreover, many of the injuries flowing from the Class Vehicles cannot be resolved through the limited remedy of replacements or adjustments, as many incidental and consequential damages have already been suffered because of Defendants' fraudulent conduct as alleged herein, and because of its failure and/or continued failure to provide such limited remedy within a reasonable time, and any limitation on Plaintiff and the other Pennsylvania Class members' remedies would be insufficient to make Plaintiff and the other Pennsylvania Class members whole.

289.    Finally, because of the Defendants' breach of warranty as set forth herein, Plaintiff and the other Pennsylvania Class members assert, as additional and/or alternative remedies, the revocation of acceptance of the goods and the return to Plaintiff and the other Pennsylvania Class members of the purchase or lease price of all Class Vehicles currently owned or leased, and for such other incidental and consequential damages as allowed.

290.    The Defendants were, on information and belief, provided notice of these issues through the findings of CARB. Furthermore, Defendants were provided notice of these issues by a letter from Plaintiffs, sent on November 7, 2016.

291.    As a direct and proximate result of the Defendants' breach of express warranties, Plaintiff and the other Pennsylvania Class members have been damaged in an amount to be determined at trial.

## **REQUEST FOR RELIEF**

WHEREFORE, Plaintiffs, individually and on behalf of the other members of the Nationwide Class and State Classes, respectfully request that the Court grant certification of the proposed Nationwide and State Classes, including the designation of Plaintiffs as the named representatives of the Nationwide Class and respective State Classes, appoint the undersigned as Class Counsel, and designate any appropriate subclasses, under the applicable provisions of Fed. R. Civ. P. 23, and enter judgment in their favor and against Defendants, as follows:

A.    An order temporarily and permanently enjoining Defendants from continuing the unlawful, deceptive, fraudulent, harmful, and unfair business conduct and practices alleged in this Complaint;

B.    Injunctive and equitable relief in the form of a comprehensive program to repair, retrofit, and/or buyback all Class Vehicles, and to fully reimburse and make whole all class members for all costs and economic losses, and degradation of mileage performance, durability, and reliability that the Class Vehicles will incur by being brought into compliance with federal and state law;

C.    Environmental reparations, mitigation, and remediation to offset the harm caused by the illegal emissions of the Class Vehicles, based on the mileage driven by all the Class Vehicles and/or other appropriate measures of environmental harm;

D.    A declaration that the Defendants are financially responsible for all Class notice and the administration of Class relief;

E.    Costs, restitution, compensatory damages for economic loss and out-of-pocket costs, multiple damages under applicable state laws, punitive and exemplary damages under applicable law, and disgorgement, in an amount to be determined at trial;

F.      Rescission of all Class Vehicles purchases or leases, including reimbursement and/or compensation of the full purchase price of all Class Vehicles, including taxes, licenses, and other fees;

G.      Any and all applicable statutory and civil penalties;

H.      An order requiring Defendants to pay both pre- and post-judgment interest on any amounts awarded;

I.      An award of costs and attorneys' fees, as allowed by law;

J.      Leave to amend this Complaint to conform to the evidence produced at trial; and

K.      Such other or further relief as the Court may deem appropriate, just, and equitable.

## <u>DEMAND FOR JURY TRIAL</u>

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury of any and all issues in this action so triable of right.

**DATED:**  November 10, 2016

s/ Bryan L. Bleichner
Bryan L. Bleichner
**CHESTNUT CAMBRONNE PA**
17 Washington Avenue, North, Suite 300
Minneapolis, Minnesota  55401
Telephone: 612-339-7300
bbleichner@chestnutcambronne.com

W. Daniel "Dee" Miles, III (*pro hac vice* motion to be filed)
H. Clay Barnett, III (*pro hac vice* motion to be filed)
Archie I. Grubb, II (*pro hac vice* motion to be filed)
**BEASLEY, ALLEN, CROW,**
**METHVIN, PORTIS & MILES, P.C.**
272 Commerce Street
Montgomery, Alabama  36104
Telephone: 334-269-2343
Dee.Miles@Beasleyallen.com

Clay.Barnett@BeasleyAllen.com
Archie.Grubb@Beasleyallen.com

Adam J. Levitt (*pro hac vice* motion to be filed)
Daniel R. Ferri (*pro hac vice* motion to be filed)
**GRANT & EISENHOFER P.A.**
30 North LaSalle Street, Suite 2350
Chicago, Illinois  60602
Telephone:  312-214-0000
alevitt@gelaw.com
dferri@gelaw.com

Jeff A. Almeida (*pro hac vice* motion to be filed)
Kyle McGee (*pro hac vice* motion to be filed)
**GRANT & EISENHOFER P.A.**
123 Justison Street, 7th Floor
Wilmington, Delaware  19801
Telephone: 302-622-7122
jalmeida@gelaw.com
kmcgee@gelaw.com

Mark DiCello (*pro hac vice* motion to be filed)
**THE DICELLO LAW FIRM**
7556 Mentor Avenue
Mentor, Ohio  44060
Telephone: 440-953-8888
madicello@dicellolaw.com

Thomas L. Young  (*pro hac vice* motion to be filed)
**LAW OFFICE OF THOMAS L. YOUNG, P.A.**
209 South Howard Avenue
Tampa, Florida 33606
Telephone: 813-251-9706
tyoung@tlylaw.com

***Counsel for Plaintiffs and for the Proposed Classes***